TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

LORINDA LARYEA
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
WILLIAM HOCHUL III
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

FILED

2026 JUN 17 PH 6: 01

CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

2:26-mj-0459-EJY

CR-26-00660-PHX-DGC (MTM)

# SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. |
| Plaintiff, | **I N D I C T M E N T** |
| | VIO: 18 U.S.C. § 1349 (Conspiracy) Count 1 |
| vs. | 18 U.S.C. 1347 (Health Care Fraud) Counts 2–4 |
| Brian Rowan, | 18 U.S.C. § 371 (Conspiracy) Count 5 |
| Defendant. | 42 U.S.C. § 1320a-7b(b)(2)(B) 18 U.S.C. § 2 (Payment of Kickbacks) Counts 6–8 |
| | 18 U.S.C. § 1957 (Transactional Money Laundering) Counts 9–10 |
| | 18 U.S.C. § 981(a)(1)(A), (C) 18 U.S.C. § 982(a)(1), (7), (b) 18 U.S.C. § 853 28 U.S.C. § 2461(c) (Forfeiture Allegations) |

**THE GRAND JURY CHARGES:**

At all times material to this Indictment, within the District of Arizona and elsewhere:

**INTRODUCTION**

1. Defendant BRIAN ROWAN, an executive of a company that sold amniotic membrane allografts, caused hundreds of millions of dollars in illegal kickbacks, bribes, and rebates to be paid to sales representatives and medical providers across the country to unlawfully induce providers to buy the company's allografts. BRIAN ROWAN and his co-conspirators used sham invoices and pass-through bank accounts associated with a shell

-2-

company to conceal the illegal kickbacks, bribes, and rebates. They then lied to Medicare about the providers' actual acquisition cost of the allografts, inflating Medicare's reimbursement for the allografts. Induced by these unlawful financial incentives, sales representatives and providers targeted elderly patients, many of whom were terminally ill in hospice care, and caused medically unreasonable and unnecessary allografts to be applied to these vulnerable patients. From approximately December 2021 through June 2024, providers billed Medicare and other federal health care programs over $4 billion for this company's allografts, resulting in over $2 billion in taxpayer-funded reimbursements. This significant spike in billions of dollars in allograft claims was driven not by medical necessity, but by an illegal kickback and bribery scheme that generated significant profits and lavish lifestyles for sales representatives and providers who participated. BRIAN ROWAN received over $24 million from the company, which he used to purchase multi-million-dollar houses, million-dollar life insurance policies, luxury vehicles, and luxury watches.

<strong>The Defendant and Related Individuals and Entities</strong>

2.    Defendant BRIAN ROWAN was a resident of Las Vegas, Nevada. BRIAN ROWAN was Company 1's Vice President of Sales.

3.    "Company 1" was a limited liability company formed under the laws of Texas, with its principal place of business in Fort Worth, Texas. Company 1 was a wholesale distributor that exclusively sold certain amniotic membrane allografts made from human placental tissue ("allografts"). These allografts were applied to wounds to assist with wound closure. Company 1 acquired allografts from tissue banks and relabeled them for distribution and sale to providers throughout the United States. Company 1 charged up to $1,450 per square centimeter for its allografts, with the markup on some of its allografts exceeding 2,000%.

4.    Alexandra Gehrke ("Gehrke") was a resident of Phoenix, Arizona. Gehrke co-owned, controlled, and operated Apex Mobile Medical LLC ("Apex Mobile") and Apex

Medical LLC ("Apex") and was Apex's Chief Executive Officer. Gehrke had controlling authority over APX Mobile Medical LLC ("APX"). Gehrke solely owned, controlled, and operated Viking Medical Consultants LLC, d/b/a Viking Medical Marketing LLC ("Viking").

5. Jeffrey King ("King") was a resident of Phoenix, Arizona. King was an Apex sales representative before becoming a co-owner and managing partner of APX. King married Gehrke in or around February 2024.

6. Apex Mobile was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex Mobile was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for the furnishing of allografts purchased from Company 1.

7. APX was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. APX was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for the furnishing of allografts purchased from Company 1.

8. Apex was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Apex also referred patients to enrolled Medicare providers, including Apex Mobile and APX, for the furnishing of allografts purchased from Company 1.

9. Viking was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Viking arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Viking also referred patients to enrolled Medicare providers, including APX, for the furnishing of allografts purchased from Company 1.

10. "Provider 1" was a licensed medical doctor and resident of Los Angeles, California. Provider 1 was an enrolled Medicare provider.

**The Medicare Program**

11.     The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

12.     Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

13.     Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" covered, among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers (collectively, "providers").

14.     Part B claims were processed by Medicare Administrative Contractors ("MACs"), each of which had jurisdiction over claims submitted in a specific geographic area. Noridian Healthcare Solutions ("Noridian") was the MAC that covered Arizona, California, and Nevada, among other U.S. states.

15.     Enrolled Medicare providers could submit claims to obtain reimbursement for items and services provided to beneficiaries.

16.     Medicare paid for claims only if the items (including allografts) and services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered and provided by qualified health care providers, accurately documented, and provided as represented to Medicare. Medicare would not pay for items (including allografts) and services that were procured through illegal kickbacks, bribes, and rebates.

17. Medicare reimbursed claims for certain bioengineered skin substitutes, including certain allografts, under Part B. Allograft manufacturers and labelers, including Company 1, were required to report quarterly to Medicare their total sales and units sold to all purchasers in the United States for each allograft product. Based on that data, Medicare calculated the product's Average Sales Price ("ASP"), which was the market-weighted average of the actual sales price. Once published by Medicare, the ASP was the standardized reimbursement rate for that allograft.

18. Before the ASP for an allograft was published by Medicare for a new allograft product on the market, MACs developed payment limits based on either a percentage of the product's wholesale acquisition cost or the cost reflected in sales invoices. Noridian reimbursed claims for allografts based on the cost that manufacturers and labelers, including Company 1, charged providers for allografts for which Medicare had not yet published the ASP.

19. Beginning in or around June 2022, Noridian required Medicare providers within its jurisdiction to include the "total invoice price" in claims submitted for allografts that did not have a Medicare ASP. Noridian defined the "total invoice price" as the net amount a provider paid for an item or service "taking into account ALL discounts, rebates, refunds, or other adjustments."

20. Beginning in or around November 2022, Noridian required Medicare providers within its jurisdiction to report and return to Medicare any additional amount received by the provider in the form of discounts, rebates, refunds, or other adjustments as overpayments for allografts previously billed to and reimbursed by Medicare that did not have a Medicare ASP.

### CHAMPVA

21. The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the United States Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care

program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans of the United States military who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-related service-connected disability.

22. In general, CHAMPVA covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to another health care benefit program, including Medicare, and reimbursed costs that the primary health care benefit program did not cover. For Medicare beneficiaries with CHAMPVA coverage, health care claims were first sent to Medicare for processing, and then Medicare electronically forwarded claims to CHAMPVA.

23. CHAMPVA was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

## TRICARE

24. TRICARE was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency, an agency of the DOD, was the governmental entity responsible for overseeing and administering TRICARE.

25. TRICARE offered health insurance benefits for items and services that were medically necessary. TRICARE reimbursed providers based on payment rates from applicable fee and rates schedules. Generally, when a beneficiary was eligible for Medicare and TRICARE, TRICARE was secondary to Medicare.

26. TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

### Commercial Insurance Plans

27. Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services. Individuals who received benefits from Commercial Insurers were referred to as "members."

28. Commercial Insurers often made payments directly to providers, rather than to members who received the health care benefits, items, and services.

29. To obtain payment for treatment or services provided to a member, providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically.

30. When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and provided as represented.

31. Each of the Commercial Insurers was a "health care benefit program," as defined in 18 U.S.C. § 24(b), and affected interstate commerce.

### COUNT 1
### Conspiracy to Commit Wire Fraud and Health Care Fraud
### (18 U.S.C. § 1349)

The factual allegations in the preceding paragraphs are incorporated by reference and re-alleged as though fully set forth herein.

32. Beginning in or around December 2021, and continuing through in or around June 2024, in the District of Arizona and elsewhere, Defendant, BRIAN ROWAN,

- 8 -

individually and through Company 1, knowingly and willfully agreed and conspired with other individuals and entities known and unknown to the grand jury to commit the following offenses against the United States: wire fraud, in violation of 18 U.S.C. § 1343; and health care fraud, in violation of 18 U.S.C. § 1347.

<strong>Purpose of the Conspiracy</strong>

33.    The purpose of the conspiracy was for defendant BRIAN ROWAN and his co-conspirators to unlawfully enrich themselves by, among other things: (a) offering and paying illegal kickbacks and bribes to sales representatives to induce the recommending and arranging for the purchasing and ordering of Company 1 allografts and the referral of patients to providers for the furnishing of Company 1 allografts; (b) offering and paying illegal kickbacks, bribes, and rebates to providers to induce the purchasing and ordering of Company 1 allografts; (c) causing the submission of false and fraudulent claims to Medicare that falsely represented providers' actual acquisition cost of Company 1 allografts; (d) causing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and the Commercial Insurers for items and services that were (i) medically unreasonable and unnecessary, (ii) ineligible for reimbursement, and (iii) procured through illegal kickbacks, bribes, and rebates; (d) concealing the payment of the kickbacks, bribes, and rebates; and (e) diverting proceeds of the fraud for the personal use and benefit of BRIAN ROWAN and his co-conspirators, and to further the fraud.

<strong>Manner and Means of the Conspiracy and Scheme</strong>

34.    The manner and means used by BRIAN ROWAN and others, individually and through the entities described above and others, to effect the objects of the conspiracy and scheme to defraud, included the following:

<strong><em>Paying Illegal Kickbacks to Sales Representatives</em></strong>

35.    BRIAN ROWAN, through Company 1, and others contracted with "sales representatives," including Gehrke, to purportedly market and distribute Company 1 allografts to medical practices and individual medical providers across the country.

- 9 -

36. BRIAN ROWAN, through Company 1, and others paid illegal kickbacks and bribes to sales representatives, including Gehrke, to induce the sales representatives to recommend and arrange for the purchasing and ordering of Company 1 allografts and to refer patients to providers for the furnishing of Company 1 allografts. The illegal kickbacks and bribes BRIAN ROWAN, through Company 1, and others paid to sales representatives were calculated based on the quantity and size of Company 1 allografts purchased by the medical practices and providers recruited by the sales representatives.

37. As BRIAN ROWAN knew, Gehrke, individually and through Apex and Viking, was Company 1's sales representative for Apex Mobile and APX, among other providers.

38. As BRIAN ROWAN knew, Gehrke, through Apex and Viking, contracted with medically untrained sales representatives to (a) identify elderly Medicare beneficiaries with wounds of any stage; (b) arrange for and recommend the ordering and purchasing of Company 1 allografts to be applied to those wounds; and (c) refer those patients to Apex Mobile and APX, both of which were controlled by Gehrke, for the furnishing of Company 1 allografts.

39. Gehrke and King instructed the sales representatives to go to facilities with elderly populations, including hospice facilities, nursing homes, and assisted living facilities, to identify patients with wounds, take photographs of the patient's wound, measure the size of the wound, and obtain copies of the patient's insurance card. Gehrke directed the sales representatives to order Company 1 allografts only in sizes 4cm x 6cm and larger—despite the availability of smaller sizes of allografts—even if the patient's wound was much smaller.

40. From in and around July 2022, through in and around March 2024, BRIAN ROWAN, through Company 1, and others paid over $271 million in illegal kickbacks and bribes to Gehrke, through Apex and Viking, based on the quantity and size of allografts that Apex Mobile, APX, and other providers purchased from Company 1 and billed to

Medicare and other health care benefit programs. Gehrke, in turn, used those illegal kickbacks and bribes to pay tens of millions of dollars in illegal kickbacks and bribes to Apex's and Viking's sales representatives.

*Inducing Allograft Purchases with Rebates*

41.    To induce medical providers to purchase Company 1 allografts, BRIAN ROWAN, through Company 1, and others agreed to pay and paid providers illegal kickbacks, bribes, and rebates. These illegal payments were structured to falsely appear as legitimate business arrangements, such as "Rebate Agreements," while concealing and disguising their true nature as illegal inducements to generate orders and purchases of Company 1 allografts.

42.    BRIAN ROWAN, through Company 1, and others authorized rebates to be applied to Company 1 allografts purchased by providers even if the provider did not purchase the minimum quantity of allografts to qualify for the "rebate" under their Rebate Agreement, illustrating that the Rebate Agreements were a sham.

43.    BRIAN ROWAN and others, through Company 1, sold allografts at a stated purchase price that BRIAN ROWAN and others knew was the cost that providers disclosed to Medicare and other health-care benefit programs. In fact, BRIAN ROWAN and others knew and intended that providers would receive illegal kickbacks, bribes, and rebates from Company 1 that substantially reduced the providers' true net cost of acquiring the allografts. BRIAN ROWAN and others knew and intended that these illegal kickbacks, bribes, and rebates would be concealed from Medicare and other health care benefit programs, such that it was not disclosed that the actual acquisition cost of the allografts to the providers was materially lower than the amounts being represented to Medicare and other health care benefit programs.

44.    BRIAN ROWAN and others sent marketing materials to Gehrke and other Company 1 sales representatives that highlighted the difference between Medicare's reimbursement rates for various sizes of Company 1 allografts and the "rebated" amount

that providers would pay Company 1 for those allografts. For example, BRIAN ROWAN gave Company 1 sales representatives a document indicating that a provider with a 40% "rebate" who submitted a claim to Medicare for one 4cm x 6cm allograft would be reimbursed $11,232 from Medicare and owe only $8,424 to Company 1 for the allograft, resulting in a difference of $2,808. BRIAN ROWAN and others represented to providers that they could retain the amount of the "rebate" as profit.

45.    As BRIAN ROWAN and others knew and intended, providers submitted and caused to be submitted false and fraudulent claims to Medicare and other health care benefit programs seeking reimbursement at the full invoiced price, without disclosing to Medicare and other health care benefit programs the illegal kickback payments in the form of the actual "rebated" amount that reduced the providers' true net cost of acquiring the allografts. Instead, as BRIAN ROWAN and others knew and intended, providers kept as profit the difference between Medicare's reimbursement and the discounted price paid to Company 1 for its allografts.

### The Sham Invoice Scheme: Lying to Medicare About Providers' Actual Acquisition Cost of Company 1 Allografts and Concealing Illegal Kickbacks to Providers

46.    After Noridian required providers to submit claims based on the "total invoice price," defined as the net amount paid for an item taking into account all discounts, rebates, and other adjustments, BRIAN ROWAN and others concealed and disguised the rebates, including by authorizing and facilitating the issuance of sham invoices to providers that did not include the rebate and instead reflected only the full, non-rebated price of the allografts.

47.    BRIAN ROWAN and others instructed providers to use the sham, full-price invoices for Medicare reimbursement, even when the invoices themselves reflected the purchase of a quantity of allografts that met or exceeded the quantity required by the providers' Rebate Agreement to qualify for the rebate and therefore entitled the providers to such a rebate under the terms of the purported agreement.

- 12 -

48.    BRIAN ROWAN and others knew and intended that sham, full-price invoices be submitted to Medicare, including by authorizing and facilitating the issuance of sham, full-price invoices to Company 1 sales representatives and providers who expressly stated that the invoices would be submitted to Medicare for reimbursement.

49.    As BRIAN ROWAN and others knew, intended, and directed, providers used the sham, full-price invoices to falsely represent the "total invoice price"—the actual acquisition cost—of Company 1 allografts to Medicare and Noridian, thereby inflating Medicare's reimbursement of Company 1 allografts to the providers and unlawfully inducing providers to purchase Company 1 allografts.

### *The Shell Company Scheme: Lying to Medicare About Providers' Actual Acquisition Cost of Company 1 Allografts and Concealing Illegal Kickbacks to Providers*

50.    Beginning in and around December 2022, BRIAN ROWAN and others sought to circumvent the June and November 2022 MAC rules and deceive Medicare and its contractors because he and others knew that providers were ordering Company 1 allografts because of the significant profit margins provided by the illegal kickbacks, bribes, and rebates. In order to induce the providers to continue ordering Company 1 allografts and maintain comparable profit margins, BRIAN ROWAN and others set up a shell company scheme.

51.    BRIAN ROWAN and others used a shell company to funnel illegal kickbacks to providers in return for purchasing Company 1 allografts.

52.    In and around December 2022, BRIAN ROWAN and others emailed dozens of Company 1 sales representatives to inform them of the "new model" that was designed to conceal and disguise the illegal kickback scheme and fraudulently evade the June and November 2022 MAC rules that required providers to submit claims based on the actual acquisition cost of Company 1 allografts and repay Medicare for any rebates, discounts, refunds, or other adjustments received after Medicare reimbursed for the non-rebated amount.

53. In and around January 2023, BRIAN ROWAN and others invited several providers to enter into these new shell company kickback arrangements with Company 1. All invited providers were subject to MAC rebate reporting requirements.

54. BRIAN ROWAN and others sent invoices to providers that purportedly reflected the price of the Company 1 allografts purchased by the provider. Providers used this invoice amount to bill Medicare and other health care benefit programs, which reimbursed the provider based on the price represented on the invoice. Once the provider received Medicare's reimbursement, the provider paid the full amount of the reimbursement to Company 1. Company 1 immediately transferred that amount to a bank account associated with the provider and controlled by Company 1 but held in the name of the shell company. Company 1 then kicked approximately 40% of that amount from the pass-through bank account back to the provider as an illegal kickback and bribe in exchange for purchasing Company 1 allografts.

55. For example, in order to conceal and disguise the illegal kickback scheme and fraudulently evade the June and November 2022 Noridian rules, ROWAN, Gehrke, King, and others entered into an illegal agreement to use a shell company and pass-through bank account. On or about April 11, 2023, Company 1 opened a bank account ending in 3585 under the name of the shell company and associated with APX ("Shell Company 1 Account"). From on or about June 20, 2023, through on or about November 16, 2023, APX transferred approximately $325,854,000 in Medicare reimbursements for Company 1 allografts to Company 1. Company 1, in turn, deposited approximately $325,854,000 into the Shell Company 1 Account. Of that amount, Company 1, through the Shell Company 1 Account, paid APX approximately $130,341,000—or 40% of the Medicare reimbursements—in unlawful kickbacks.

56. Through this shell company and related pass-through bank accounts, BRIAN ROWAN and others caused providers to falsely represent to Medicare the providers' actual acquisition cost of Company 1 allografts by issuing invoices that did not reflect the

amounts that Company 1 kicked back to the provider in exchange for purchasing the allografts.

### Billing Medicare and Other Health Care Benefit Programs for Allografts that were Medically Unreasonable and Unnecessary

57. Induced by illegal kickbacks and bribes from BRIAN ROWAN, through Company 1, and others, providers, including Apex Mobile and APX, caused medically unreasonable and unnecessary Company 1 allografts to be applied to vulnerable patients. The allografts were medically unreasonable and unnecessary because, among other reasons, the wounds were infected, the wounds had already healed, the wounds were not responding to the allografts, the wounds would not heal because of the terminally ill patients' comorbidities, the allografts exceeded the size of the wound, care was not coordinated with the patients' primary and other treating practitioners, and allografts were ordered by medically untrained sales representatives.

58. From in or around December 2021, through in or around June 2024, providers billed Medicare and other health care benefit programs over $4 billion for Company 1 allografts. Medicare and other health care benefit programs reimbursed providers over $2.2 billion based on these claims. Many of these claims were false and fraudulent because (a) the claims falsely represented providers' actual acquisition cost of Company 1 allografts; (b) the allografts were medically unreasonable and unnecessary; (c) the allografts were procured through illegal kickbacks and bribes to sales representatives; and (d) the allografts were procured through illegal kickbacks, bribes, and rebates to providers.

59. From in or around November 2022, through in or around April 2024, Apex Mobile and APX submitted approximately $1.2 billion in false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and Commercial Insurers for Company 1 allografts. Medicare, TRICARE, CHAMPVA, and Commercial Insurers paid approximately $614 million based on these claims. All of these claims were false and fraudulent because (a) the claims falsely represented the providers' actual acquisition cost of Company 1 allografts;

(b) the allografts were medically unreasonable and unnecessary; (c) the allografts were procured through illegal kickbacks and bribes to Apex, Viking, Gehrke, and other sales representatives; and (d) the allografts were procured through illegal kickbacks, bribes, and rebates to Apex Mobile and APX.

60.    From December 2021 through June 2024, BRIAN ROWAN received over $24 million from Company 1, which he used to purchase multiple multi-million-dollar houses, million-dollar life insurance policies, luxury vehicles, including a $135,000 Maserati, and luxury watches.

All in violation of 18 U.S.C. § 1349.

## COUNTS 2–4
### Health Care Fraud
### (18 U.S.C. §§ 1347, 2)

61.    The factual allegations in paragraphs 1 through 31 are incorporated by reference and re-alleged as though fully set forth herein.

62.    Beginning in or around December 2021, and continuing through in or around June 2024, in the District of Arizona and elsewhere, Defendant BRIAN ROWAN, along with other individuals and entities known and unknown to the grand jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, TRICARE, CHAMPVA, and Commercial Insurers, which are health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representatives, and promises, money and property owned by, and under the custody and control of, the health care benefit programs.

### Purpose of the Scheme

63.    Paragraph 33 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

- 16 -

**Manner and Means of the Scheme**

64.    Paragraphs 34 through 60 above are incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme.

**Executions of the Scheme**

65.    On or about the dates specified below, in the District of Arizona and elsewhere, Defendant BRIAN ROWAN, aided and abetted by, and aiding and abetting, others known an unknown to the grand jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for Company 1 allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks, bribes, and rebates, in an attempt to execute, and in execution of, the scheme as described in paragraphs 34 through 60 above, with each execution set forth below forming a separate count:

| Count | Approx. Claim Submission Date | Medicare Beneficiary | Billing Provider | Approx. Amount Billed to Medicare |
|-------|-------------------------------|----------------------|------------------|-----------------------------------|
| 2 | July 21, 2023 | J.Z. | APX | $78,300 |
| 3 | August 8, 2023 | J.E. | APX | $99,900 |
| 4 | October 4, 2023 | E.H. | APX | $98,600 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

## COUNT 5
**Conspiracy to Defraud the United States and to Pay Health Care Kickbacks
(18 U.S.C. § 371)**

The factual allegations in paragraphs 1 through 31 are incorporated by reference and re-alleged as though fully set forth herein.

66.    Beginning in or around December 2021, and continuing through in or around June 2024, in the District of Arizona and elsewhere, Defendant BRIAN ROWAN, individually and through Company 1, along with other individuals and entities known and

unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to: defraud the United States by cheating the United States government and any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means the lawful government functions of HHS and CMS in their administration and oversight of Medicare; and offering and paying illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and (B).

### Purpose of the Conspiracy

67.    Paragraph 33 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the conspiracy.

### Manner and Means of the Conspiracy

68.    Paragraphs 34 through 60 are incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the conspiracy.

### Overt Acts

69.    In furtherance of the conspiracy, and to effect the objects of the conspiracy, Defendant BRIAN ROWAN committed or caused to be committed various overt acts in the District of Arizona and elsewhere, including but not limited to the following:

a.    On or about December 8, 2021, BRIAN ROWAN emailed a spreadsheet to Gehrke and another Company 1 sales representative that calculated the profit a provider with a 30%, 35%, or 40% rebate would make for various sizes of Company 1 allografts after Medicare's reimbursement, and the amount of money a Company 1 sales representative would make if receiving a 25%, 30%, 35%, or 40% "commission" per allograft.

b.    On or about July 1, 2023, BRIAN ROWAN received a text message from Gehrke with two flyers promoting Apex's "Race to 10 Million Sales Contest" for Apex sales representatives offering, among other things, "private airfare" to Las Vegas to attend a dinner with Company 1 executives. BRIAN ROWAN responded, "Looks great!"

c.      On or about August 8, 2023, BRIAN ROWAN had a meeting with Provider 1, a Company 1 employee, and a Company 1 sales representative in Arizona. During the meeting, ROWAN told Provider 1 that "even though you make money off of [Company 1 allografts], OIG [Office of Inspector General] and DOJ [Department of Justice], they don't want you to ever acknowledge you're making money off it . . . ."

d.      On or about September 19, 2023, APX received an illegal kickback in the approximate about of $7,173,360 via wire transfer from the Shell Company 1 Account to APX's bank account ending in 7158.

e.      On or about September 27, 2023, BRIAN ROWAN emailed Company 1 employees, copying Gehrke, stating that starting on October 1, 2023, "the commission for Apex/Lexie Gehrke will be 60% on all new orders," increasing the illegal kickbacks Company 1 paid Apex and Gehrke.

f.      On or about November 1, 2023, APX received an illegal kickback in the approximate amount of $15,298,480 via wire transfer from the Shell Company 1 Account to APX's bank account ending in 7158.

g.      On or about November 7, 2023, APX received an illegal kickback in the approximate amount of $11,981,760 via wire transfer from the Shell Company 1 Account to APX's bank account ending in 7158.

h.      On or about December 8, 2023, Apex received an illegal kickback in the approximate amount of $71,148,550 via wire transfer from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686.

i.      On or about January 8, 2024, Apex received an illegal kickback in the approximate amount of $81,782,416 via wire transfer from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686.

All in violation of 18 U.S.C. § 371.

## COUNTS 6–8
### Offer and Payment of Kickbacks
### (42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2)

The factual allegations in paragraphs 1 through 31 and 33 through 60 are incorporated by reference and re-alleged as though fully set forth herein.

70. On or about the approximate dates set forth below, in the District of Arizona and elsewhere, BRIAN ROWAN, aided and abetted by, and aiding and abetting, others known an unknown to the grand jury, did knowingly and willfully offer and pay remuneration, specifically, kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, as set forth below:

| Count | Approx. Date | Originating Account | Receiving Account | Description |
|---|---|---|---|---|
| 6 | September 19, 2023 | Shell Company 1 Account | APX's Bank Account Ending in 7158 | $7,173,360 Wire Transfer |
| 7 | November 1, 2023 | Shell Company 1 Account | APX's Bank Account Ending in 7158 | $15,298,480 Wire Transfer |
| 8 | December 8, 2023 | Company 1's Bank Account Ending in 3813 | Apex's Bank Account Ending in 9686 | $71,148,550 Wire Transfer |

Each in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2.

## COUNTS 9–10
### Transactional Money Laundering
### (18 U.S.C. §§ 1957 and 2)

71. The factual allegations in paragraphs 1 through 31 are incorporated by reference and realleged as though fully set forth herein.

72. On or about the approximate dates listed below, Defendant BRIAN ROWAN, aided and abetted by, and aiding and abetting, other individuals and entities known and unknown to the grand jury, in the District of Arizona and elsewhere, knowingly engaged and attempted to engage in the following monetary transactions in the United States with criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, health care fraud, in violation of 18 U.S.C. § 1347, conspiracy to defraud the United States and to pay illegal health care kickbacks, in violation of 18 U.S.C. § 371, and paying illegal health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(2):

| Count | Approx. Date | Originating Account | Description of Item Purchased | Approx. Amount |
|---|---|---|---|---|
| 9 | December 8, 2023 | Wells Fargo Account Ending in 9239 | 2023 Rolex Daytona Watch | $47,685 |
| 10 | December 18, 2023 | Avantax Investment Account Ending in 9704 | Life Insurance Policy Ending in 9137 | $1,000,000 |

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. § 981(a)(1)(A) and (C), 18 U.S.C. §§ 982(a)(1) and (7), (b), 18 U.S.C. § 853, 28 U.S.C. § 2461(c))**

The factual allegations in the preceding paragraphs are incorporated by reference and re-alleged as though fully set forth herein.

73. Pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), and upon conviction of one or more of the offenses alleged in Counts 1 through 10 of this Indictment, Defendant BRIAN ROWAN shall forfeit to the United States all right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including the following: (a) all money or other property that was

- 21 -

involved in any violation of a statute listed in 18 U.S.C. § 981(a)(1)(A) or 982(a)(1), and (b) all other property constituting or derived from gross proceeds of a federal health care offense or proceeds of a violation of a statute listed in 18 U.S.C. § 981(a)(1)(C), including, but not limited to the sum of money representing the amount of money involved in or constituting proceeds of the offense(s).

74.    If any of the forfeitable property, as a result of any act or omission of the defendant(s):

    a.  cannot be located upon the exercise of due diligence,

    b.  has been transferred or sold to, or deposited with, a third party,

    c.  has been placed beyond the jurisdiction of the court,

    d.  has been substantially diminished in value, or

    e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of said defendant(s) up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

///

///

///

75.    All in accordance with 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2.

A TRUE BILL

s/
_____
FOREPERSON OF THE GRAND JURY
Date: June 17, 2026

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

s/
_____
MATTHEW WILLIAMS
Assistant U.S. Attorney

LORINDA LORYEA
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

s/
_____
SHANE BUTLAND
WILLIAM HOCHUL III
Trial Attorneys

- 23 -